IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

CHRISTOPHER ROE,  |
        Plaintiff  |           CIVIL ACTION NO.
           |
v.          |
           |        **COMPLAINT AND JURY DEMAND**
GRINNELL COLLEGE,  |
           |
        Defendant.  |

Plaintiff Christopher Roe ("Plaintiff"),[1] by his attorneys Nesenoff & Miltenberg, LLP and Babich Goldman, P.C., as and for his Complaint against Defendant Grinnell College ("Grinnell" or the "College") alleges as follows:

## THE NATURE OF THE ACTION

1.     This action arises out of the actions and omissions, and the policies and procedures employed by the College, concerning false allegations of sexual misconduct lodged against Plaintiff by a female Grinnell student, Jane Doe[2] over two years after the alleged occurrence, only months before his graduation.

2.     Jane Doe filed a Title IX complaint against Plaintiff at the same time that she joined a group of female students in filing a sexual harassment complaint against a male professor. The group falsely publicized that the professor had been fired and had engaged in prior instances of sexual harassment—statements which were later retracted.

3.     Jane Doe was also, upon information and belief, friends with a female student who had made false allegations against Plaintiff's roommate and started a smear campaign against

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym. There were two recent lawsuits against Grinnell in the public record, captioned "John Doe v. Grinnell College et al.," Case No. 4:17-cv-00079-RGE-SBJ ("*Grinnell 1*"), and "Peter P. Moe v. Grinnell College," Case No. 4:20-cv-00058-RGE-SBJ ("*Grinnell 2*"). Plaintiff has elected to use "Christopher Roe" in order to avoid confusion between the cases.

[2] This is a pseudonym.

Plaintiff's roommate and other male students, about which the College did little or nothing. Plaintiff sought a no contact order against this student after Plaintiff's roommate was forced to leave the College. Jane Doe filed her complaint shortly after the departure of Plaintiff's roommate.

4.      When Jane Doe made the allegations against Plaintiff, and spoke with the Title IX investigator, she referred to another male student—***not Plaintiff***—as the perpetrator of the alleged sexual misconduct. This was not questioned.

5.      Plaintiff was not made aware of Jane Doe's allegations until several weeks after she made her Title IX complaint. When the College's Title IX Coordinator met with Plaintiff, she informed him about Jane Doe's allegations and referenced a second, anonymous complaint. While Grinnell elected not to pursue the anonymous complaint, the Title IX Coordinator used it to open a formal investigation against Plaintiff under a purported pattern of behavior, and to leverage Jane Doe's complaint, which was weak and lacking in credibility.

6.      Per Jane Doe's own statements to the College's Title IX investigator and the College's adjudicator, the Hon. Marsha Ternus ("Justice Ternus"), she consented to certain sexual activities with Plaintiff while making out with him on the night in question. With respect to an alleged act of digital penetration—which followed a number of consensual acts and which Plaintiff denied even occurred—Jane Doe admitted that she did not say no, and that she did not tell Plaintiff to stop that activity at any point in time. Though this encounter occurred with the lights out, Jane Doe asserted that Plaintiff should have figured out that she did not consent to the alleged activity because of her facial expression.

7.      Even assuming that the activity in question occurred (it did not), under Grinnell's applicable sexual misconduct policy Jane Doe was required to withdraw consent to the ongoing

sexual activity by mutually understandable words or clear, unambiguous actions. This she did not do.

8.      No decisionmaker in the Title IX process questioned Jane Doe's credibility. They simply assumed that because Plaintiff denied that the act of digital penetration occurred, Plaintiff was not telling the truth. All of the decisionmakers in Plaintiff's case placed the burden on him to prove that he did not sexually assault Jane Doe. Despite clear policy language to the contrary, they assumed that Plaintiff was at all times responsible for obtaining Jane Doe's consent.

9.      The adjudicator in Plaintiff's case, Justice Ternus, possesses outdated and discriminatory views of gender, including the autonomy and choices of females in sexual encounters, that influenced her decision-making process and caused her to find Plaintiff responsible for nonconsensual sexual intercourse even though Jane Doe's own statements contradicted the finding. This is one of a number of such cases that Justice Ternus wrongfully decided. It is also believed that Justice Ternus recommended the imposition of harsh sanctions against Plaintiff, though her written recommendations were not provided to Plaintiff.

10.     Sarah Moschenross ("Ms. Moschenross"), the Dean of Students at the time, was responsible for imposing sanctions on Plaintiff as a result of Justice Ternus' erroneous finding. Even though she is purported to be an impartial decisionmaker, Ms. Moschenross has published a number of posts on her social media accounts which are indicative of her bias against men. She elected to impose a number of harsh sanctions against Plaintiff, including a campus ban on the eve of his graduation, pursuant to a false narrative that Plaintiff posed a threat of harm to the community—even though he and Jane Doe had coexisted on Grinnell's campus for *over two years* prior to her Title IX complaint. Plaintiff was required to finish his coursework remotely, he was not permitted to walk at his graduation, and his Bachelors' degree was deferred for one year. The

College will further maintain a permanent, conduct record in Plaintiff's education records which will be disclosed to graduate schools and, potentially, future employers.

11.     Plaintiff appealed the finding and sanctions to former Vice President of Student Affairs Andrea Conner ("Ms. Conner"), who has expressed the belief that all sexual misconduct proceedings start with dismissal as the outcome and that students found responsible for policy violations should have to explain those findings for the rest of their lives. Unsurprisingly, Ms. Conner denied Plaintiff's appeal. Her denial letter was laden with hostility towards Plaintiff, including the comment "I am sorry to hear that you still have uncertainties about when your sexual partners are or are not consenting"—a topic that was not at issue in Plaintiff's appeal or otherwise. Ms. Conner also showed deference to Justice Ternus despite a clear lack of impartiality, and procedural errors, in the underlying proceedings.

12.     When Grinnell subjected Plaintiff to disciplinary action it did so in a way that deprived him of a fair process and discriminated against him because of his gender. Grinnell's policies and regulations as promulgated, and as applied, are gender-biased and discriminatory.

13.     Plaintiff therefore brings this action to obtain relief based on claims for violations of Title IX of the Education Amendments of 1972, state law breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful discipline/lack of fundamental fairness in disciplinary proceedings.

## THE PARTIES

14.     Plaintiff Christopher Roe is a natural person and a citizen of Tennessee. During the events described herein Plaintiff was a student at Grinnell College who resided in Grinnell, Iowa.

15.     Defendant Grinnell College, an Iowa citizen, is a private liberal arts college located in Grinnell, Iowa. It is the recipient of state and federal funding through grants and contracts.

## JURISDICTION AND VENUE

16.     This Court's federal and supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq. are civil rights claims; and (iii) the state law claims are so closely related to the federal law claims as to form the same case and controversy under Article III of the U.S. Constitution. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties.

17.     This Court has personal jurisdiction over Defendant because it is located, and conducting business, in the State of Iowa.

18.     Venue for this action properly lies in this District pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### I.     Plaintiff's Background

19.     Plaintiff was a student at the College beginning in Fall 2014 and until the Spring 2018 semester, when fellow Grinnell student Jane Doe lodged a years-old Title IX complaint against him. Prior to these allegations, which resulted in Plaintiff being "suspended" for one year on the eve of his graduation, Plaintiff had no disciplinary record and was in good standing.

### II.     The Policies and Procedures Applicable to Plaintiff's Title IX Proceedings

20.     On an annual basis, typically at the beginning of the Fall semester, Grinnell provides its enrolled students with a copy of its "Policy, Procedures and Guide to Preventing Reporting, and Responding to Sexual Misconduct and Other Forms of Interpersonal Violence"

(the "Sexual Misconduct Policy") via email. Students are also provided with a copy of Grinnell's Student Conduct policies and processes, or access to same via email.

21.     Under Iowa law, these policies and procedures create a contractual relationship between Grinnell and its students. *See, e.g. T.E. v. Linn-Mar Community School Dist.*, No. LACV 35077, 2000 WL 34514000 (Iowa Dist. Ct. Aug. 30, 2000); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443 (1984).

22.     Grinnell's relevant Sexual Misconduct Policy, last revised in September 2017, provided as follows:

(i)      The College would "respond promptly and equitably" to reports of sexual misconduct "while tailoring the resolution to best fit the facts and circumstances and the goals of Title IX." *Id.* at p. 2.

(ii)     The Sexual Misconduct Policy was intended to "[p]rovide the Grinnell College community with a clear set of behavioral standards and clear definitions of Prohibited Conduct." *Id.*

(iii)    "The College does not discriminate on the basis of… sex, gender, sexual orientation…gender identity or expression." *Id.* at p. 3.

(iv)     "Grinnell College is committed to a policy of nondiscrimination in…access to and participation in its education programs, services and activities." *Id.*

(v)      "The College, as an educational community, will promptly and equitably respond to reports of Prohibited Conduct in order to eliminate the conduct, prevent its recurrence, and address its effects on any individual or the community." *Id.* at p. 7.

(vi)     "[T]he College will act using the educational lens of Title IX." *Id.*

(vii)    "[T]he College is committed to ensuring that all reports are referred to the Title IX response team to ensure *consistent* application of the policy to all individuals and allow the College to respond promptly and equitably." *Id.* at p. 9 (emphasis added).

(viii)   "Resources are available for students, staff, and faculty, whether as Complainants, Respondents, or witnesses to provide guidance throughout the investigation and resolution of the complaint." *Id.* at p. 10.

(ix)     "In any report, investigation, or resolution of a report under this policy, every effort will be made to protect the privacy interests of all individuals involved." *Id.*

(x)     "Privacy means that information related to a report under this policy will only be shared with those who 'need to know' in order to assist in the review, investigation or resolution of the report." *Id.*

(xi)    The Sexual Misconduct Policy defines "Non-consensual Sexual Intercourse" as "[h]aving or attempting to have sexual intercourse or sexual contact with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact." *Id.* at p. 16.

23.     With respect to handling reports of sexual misconduct, the Sexual Misconduct Policy states that the "College will approach the assessment of each report with an earnest intent to understand the perspective and experience of each individual involved in order to ensure fair and impartial evaluation and resolution." *Id.* at p. 29. "Choosing to make a report, and deciding how to proceed after making the report, can be a process that unfolds over time." *Id.* The "*Complainant* can help set the pace and make decisions about how best to proceed." *Id.* at p. 30 (emphasis added).

24.     "The College does not limit the timeframe for reporting." *Id.* at p. 32. Moreover, "A Complainant's belief that there may be a lack of corroborating evidence or 'proof' should not discourage them from reporting Prohibited Conduct under this policy…as College investigator(s) receive specific training in the dynamics of sexual misconduct and the investigation of Prohibited Conduct." *Id.*

25.     The Sexual Misconduct Policy sets forth a process through which sexual misconduct complaints are formally investigated and adjudicated, known as formal resolution:

(i)     An initial assessment and resolution process are overseen by the Senior Official, defined as the Dean of Students. The Dean of Students, in consultation with the Title IX Coordinator will determine whether a report should be informally or formally resolved. *Id.* at p. 35. The initial assessment includes "explicit consideration of a Complainant's requested course of action." *Id.* at p. 36. A respondent is not notified unless and until actions taken by the College will impact the respondent. *Id.* at p. 37.

(ii)     Protective and remedial measures may be issued, to respond to "immediate health and safety concerns." *Id.* Interim protective measures must be "reasonable and appropriate" and "designed to eliminate the reported hostile environment." These measures include "remedial" measures meant to "address the Complainant's well-being and continued access to educational and employment opportunities" and "protective" measures involving "action against a Respondent." Protective measures include "[a]n interim suspension, ban or paid/unpaid leave pending the outcome of a conduct proceeding" and changing the *respondent's* course schedule, work schedule or campus housing.

(iii)    The College will maintain "consistent contact with the parties to ensure that all safety and emotional and physical well-being concerns are being addressed." *Id.* at p. 39.

(iv)     The College seeks to resolve all reports of Prohibited Conduct within 60 calendar days of the initial report or Notice of Investigation. This timeframe can be extended with good cause, but only upon written notice to the parties of the delay and the reason for the delay. *Id.* at p. 41.

(v)      When the College initiates an investigation, the Senior Official will issue a written Notice of Investigation which will include the "names of the parties, a brief description of the alleged conduct and the potential policy violations." *Id.* at p. 44.

(vi)     The College will appoint a "trained investigator or investigators to conduct a prompt, equitable, thorough and impartial investigation of reports of Prohibited Conduct." "The investigation is designed to provide a fair and reliable gathering of facts. Information gathered during the review or investigation will be used to ensure the safety of the Complainant and the College campus community." *Id.* at p. 44.

(vii)    The investigator(s) are tasked with composing a chronology of events and preparing a written report documenting the complete investigation. *Id.* at p. 45.

(viii)   "The Complainant and Respondent will have an equal opportunity to be heard, to submit information, to ask and respond to questions of the other party through the investigator, and to identify witnesses who may have relevant information. Both parties will also have equal and timely access to information that will be used in the adjudication of the report, and timely notice of meetings or proceedings at which their presence will be required or requested." *Id.*

(ix)     "Witnesses must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character…. Witnesses will not be called to meet with the adjudicator." *Id.* Any student or faculty witness who refuses to cooperate may be subject to sanction. *Id.*

(x)     "The prior sexual history of the Complainant or Respondent will never be used as evidence of character or reputation." *Id.* at p. 46.

(xi)    "Where a sufficient informational foundation exists for prior sexual history or pattern evidence, the investigator(s), in consultation with the Title IX Coordinator or Deputy Coordinator for Case Management, will assess the relevance, form and reliability of the information and determine if it is appropriate for inclusion in the written investigation report for consideration by the adjudicator in determination of responsibility and/or assigning of any sanction." *Id.* at p. 46.

(xii)   "The determination of relevant pattern evidence will be based on an assessment of whether the previous or subsequent conduct was substantially similar to the conduct under investigation or indicates a pattern of similar prohibited conduct." *Id.* at p. 46.

(xiii)  "The Dean of Students, in consultation with the investigator(s) and Title IX Coordinator or Deputy Coordinator for Case Management, has the discretion to consolidate multiple reports against a Respondent into one investigation and resolution if the evidence related to each incident would be relevant and probative in reaching a determination on the other incident. Matters may be consolidated where they involve multiple Complainants." *Id.* at p. 47.

(xiv)   "Information that is irrelevant, more prejudicial than probative, or immaterial may be redacted" from the investigation report. *Id.*

(xv)    "The purpose of the investigation is to gather facts that may help establish whether there is a reasonable basis for concluding that it is more likely than not the alleged violation of this policy has occurred." *Id.*

(xvi)   At the conclusion of the investigation, the investigator(s) issue a preliminary investigation report, which may be reviewed by the Complainant and Respondent. The Complainant or Respondent may provide comments, propose questions for the investigator(s) to ask the other party, or identify additional witnesses or sources of evidence within five (5) business days after receipt of the preliminary report. *Id.*

(xvii)  A final investigation report is then issued, which serves as the basis for adjudication. A single adjudicator—the Dean of Students, College administrator, or "trained individual external to the College"—determines responsibility by a preponderance of the evidence whether there was a violation of "conduct standards or policy." *Id.* at p. 48.

(xviii) The Dean of Students will email information to the Complainant and Respondent about the adjudication process, the date, time and place of the meeting and the name of the adjudicator. *Id.* at pp. 48-49. The College "may engage an outside individual or firm (typically experienced judges trained in the intricacies of Title IX) to

adjudicate cases of sexual assault or other forms of Prohibited Conduct as needed." *Id.* at p. 49.

(xix)   "The adjudication meeting is not intended to be adversarial; rather it is intended to be educational, corrective, and developmental." *Id.* at p. 50. Yet, at the adjudication meeting, the Respondent is required to enter a "plea" of responsible or not responsible for each "charge." *Id.* at 50. The adjudicator, frequently a judge, is tasked with recommending sanctions for policy violations, including suspension or dismissal from the College. *Id.* The Sexual Misconduct Policy also provides that College counsel may be present at the adjudication meeting. *Id.* at p. 49.

(xx)    "The adjudicator is required to review all pertinent information regarding the incident, including written statements, the investigation report, documents, items, and/or oral information from the Complainant(s), Respondent(s), and witnesses prior to the adjudication meeting(s)." *Id.*

(xxi)   The adjudicator meets separately with a "member of the investigation team," the Complainant and the Respondent. *Id.* The Respondent may not participate in the Complainant's adjudication meeting, nor is there an opportunity for Respondent to submit questions to the adjudicator to be asked of the Complainant and, thus, no form of cross-examination. The adjudicator is solely responsible for determining responsibility.

(xxii)  The Respondents, even if asserting defenses to the allegations, is required to submit a "mitigation statement" to the adjudicator, before any decision is made as to responsibility. *Id.* at 51. The Complainant is also required to submit an "impact statement" before any decision is made. *Id.* at 50.

(xxiii) At the adjudication meeting, the Complainant "if they wish" may present their own account of the events in a narrative format. *Id.* at 50. In contrast, the Respondent "will be given an opportunity, and is encouraged, to present their response" to the "charges" against them. *Id.* at 51.

(xxiv)  After the adjudicator meets with the investigator, Complainant and Respondent, the adjudicator "must reach a decision on responsibility by using the preponderance of evidence. This means that the adjudicator will decide whether it is 'more likely than not,' based upon the information provided through the investigation and at the adjudication meeting(s), that the Respondent is responsible for the alleged violation(s)." The findings are then documented in a case opinion, issued to both Complainant and Respondent, within five (5) business days of completion of the meetings.

(xxv)   If the adjudicator finds a student responsible for sexual misconduct, they will recommend sanctions to the Dean of Students (or designee). The Dean of Students is not bound by the recommendations of an external adjudicator and has the "final authority to impose appropriate educational outcomes." *Id.* at 52.

(xxvi)   A student found responsible for Non-Consensual Sexual Intercourse will "typically receive educational outcomes (sanctions) of suspension or dismissal, including a ban from campus." *Id.* at 52. Affirmative findings of responsibility in matters resolved by formal resolution become part of a student's permanent conduct record. *Id.*

(xxvii)  The Complainant and Respondent may appeal the outcome within five (5) business days of receiving notice of the outcome. *Id.* at p. 54. The only grounds for appeal are (i) new evidence and (ii) procedural errors that had a material impact on the outcome. *Id.* at 54. The burden of proof lies with the appellant and "the original determination and educational outcomes (sanctions) are presumed to have been decided reasonably and appropriately." *Id.* at p. 55.

(xxviii) The appeal officer designated for student appeals is the Assistant Vice President of Student Affairs. *Id.* at 54. If the appeal officer "has been involved in the conduct at issue in the complaint/grievance, or if the individual was consulted about the conduct at issue in the complaint/grievance, then the Title IX Coordinator will direct the appeal to another" appeal officer. *Id.* The appeal officer is designated as an "impartial decisionmaker." *Id.*

(xxix)   The appeal officer has ten (10) business days to decide and communicate the results of the appeal. *Id.* at 55. Appeal decisions are final. *Id.*

## III.   **The Definition of Consent Under Grinnell's Sexual Misconduct Policy**

26.     The Sexual Misconduct Policy is based on "affirmative consent." "Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to the end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or clear unambiguous actions that indicate a willingness to engage freely in sexual activity."

27.     The Sexual Misconduct Policy further states as follows:

a.   Each participant in a sexual encounter is expected to obtain and give consent to each act of sexual activity. Consent to one form of sexual contact does not constitute consent to engage in all forms of sexual contact.

b.   Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication

11

can lead to misunderstandings or potential policy violations. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity cannot be assumed to be giving consent.

c. If at any time it is reasonably apparent that either party is hesitant, confused or unsure, both parties should stop, decide whether to continue, and obtain mutual verbal consent before continuing such activity.

d. Consent may be withdrawn by either party at any time. Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity. Once withdrawal of consent had been expressed, sexual activity must cease.

When evaluating consent "the College will consider the *objectively apparent* indications of consent (or lack of consent) from a reasonableness perspective." *Id.* at pp. 19-20 (emphasis added).

## IV.    Plaintiff's Interactions With Jane Doe

28.    Plaintiff met Jane Doe in Fall 2015, when he was a sophomore and she was a first-year student. They took one class together.

29.    In September 2015, the two became better acquainted when they met at an on-campus party and talked at the party and afterwards.

30.    On the day after the party, Plaintiff and Jane Doe studied together during the day. In the evening hours of September 19, 2015 Jane Doe visited Plaintiff's dorm room where the two kissed and "made out" on Plaintiff's bed, fully clothed, with the lights off. While kissing, Plaintiff touched Jane Doe's breasts over her clothes. Jane Doe told Plaintiff that she was uncomfortable with him touching her breasts and he stopped. Shortly thereafter, Jane Doe said that she wasn't feeling well and he walked her home.

31.    After this encounter, Plaintiff and Jane Doe exchanged a few text messages and their communication fizzled out. Plaintiff also dropped the class the he and Jane Doe had been taking together for reasons unrelated to Jane Doe.

## V.      The False Allegations Against Plaintiff

32.      In early February 2018, Plaintiff learned from a fellow member of his sports team that it was rumored that a female student, also a member of the team, had filed a Title IX complaint against Plaintiff on behalf of another female student ("Student A"). Plaintiff also learned that Student A did not believe that a Title IX complaint against Plaintiff was warranted and did not want it filed. Plaintiff spoke to his coach, a female, about the issue, who then called the College's Title IX Coordinator, Bailey Asberry ("Ms. Asberry"). Plaintiff's coach refused to relay the details of her conversation to Plaintiff, but confirmed that no member of team had filed a complaint against Plaintiff.

33.      Shortly after, on February 2, 2018, Ms. Asberry called Plaintiff to arrange a meeting about a "Title IX complaint." Plaintiff's coach cautioned him not to bring anyone to the meeting with him since Ms. Asberry was only going to provide him with information to clear things up. She encouraged him not to bring a support person to the meeting. Plaintiff thought this advice to be suspect, and brought Rabbi Rob Cabelli[3] to the meeting as a support person.

34.      At the meeting, Ms. Asberry told Plaintiff that there were two Title IX complaints against him, one was "anonymous," the other was brought by Jane Doe. Ms. Asberry told Plaintiff that he was under investigation for one count of non-consensual sexual intercourse and would be contacted by the investigator.

35.      In a subsequent phone call, Ms. Asberry told Plaintiff's father that a formal investigation had been opened because the anonymous complaint, coupled with the Jane Doe complaint, constituted a pattern of behavior. However, prior to sitting with the College's Title IX

---

[3] Rabbi Cabelli, who served as a support person for male respondents in a number of Title IX cases, and is believed to have disagreed with the manner in which male respondents were being treated by Grinnell, suddenly left the College in August 2018.

investigator, Plaintiff was told that Grinnell was not pursuing the anonymous complaint and that he would not be asked about it during any interviews.

36.     Upon information and belief, Ms. Asberry and Ms. Moschenross bolstered Jane Doe's weak complaint with the anonymous complaint in order to open an unwarranted, formal investigation against Plaintiff.

37.     Later, the Title IX investigator did, in fact, question Plaintiff about the anonymous complaint. This information was included in the investigation report later provided to Justice Ternus even though the College had represented to Plaintiff that it was not pursuing the anonymous complainant.

38.     In early February 2018, at around the same time as she alleged a Title IX complaint against Plaintiff, Jane Doe filed a group Title IX complaint against a male Grinnell professor who allegedly engaged in sexual or gender-based harassment in the classroom setting. The claims were made public, including *false allegations* that the professor had been terminated as a result of the complaint, and that he had engaged in sexual harassment on a number of prior occasions. While Grinnell administrators publicly acknowledged the falsity of certain of the allegations, they supported the right of Jane Doe, and her fellow complainants, to speak *their* truth and deemed the allegations to be "newsworthy."

39.     It was not until he sat for an interview with Grinnell's Title IX investigator, an attorney from the law firm of Husch Blackwell, that Plaintiff learned the specifics of Jane Doe's allegations. Significantly, Plaintiff also learned that Jane Doe had first made the allegations against ***someone else***, whose name she used during her interview with the Title IX investigator. This was not questioned.

14

40.     Jane Doe alleged that, in September 2015—*over two years prior to her coming forward*—she and Plaintiff were making out in his room, fully clothed and that she became uncomfortable as the encounter allegedly progressed. She acknowledged that she consented to kissing Plaintiff and that he touched her breasts, which was consensual. Jane Doe alleged that during the encounter, Plaintiff toucher her upper thighs and attempted to put his fingers into her shorts. She also said that at some point Plaintiff succeeded in putting his fingers into her shorts, and inserted a finger into her vagina.

41.     Jane Doe told investigators that she did not tell Plaintiff to stop the allegedly objectionable activity at any point in time. Instead, she told the investigator that Plaintiff should have figured out that she did not consent to the activity by her facial expressions. However, the room was dark.

42.     Jane Doe alleged that, on the day after she was allegedly sexually assaulted, she returned to Plaintiff's dorm room. During this visit, she and Plaintiff consensually kissed for a few minutes and then he walked her home. Shortly after that, Plaintiff dropped out of the class that the two were taking together for reasons unrelated to Jane Doe.

43.     Plaintiff denied that he did anything but kiss Jane Doe and touch her breasts, over her clothes, on the evening in question.

**VI.     The Flawed and Biased Title IX Proceedings Against Plaintiff**

44.     The proceedings against Plaintiff were flawed from start to finish, beginning with the College's decision to open a formal investigation into Jane Doe's false allegations against Plaintiff because: (i) Jane Doe named a person *other than Plaintiff* as the individual responsible for engaging in nonconsensual sexual intercourse with her; (ii) Jane Doe's allegations dated back *over two (2) years prior* to the time she reported them to the Title IX Coordinator; (iii) Jane Doe

15

was, upon information and belief, close friends with another Title IX complainant who previously lodged false allegations, and a public smear campaign, against Plaintiff's roommate; and (iv) Jane Doe made contemporaneous allegations of sexual harassment against a male professor.

45.     Plaintiff's case was not resolved within 60 calendar days. Nor was he given any written notice as to the reason for the delay. *See* Sexual Misconduct Policy, at p. 41.

46.     Ms. Moschenross was, as the Dean of Students, responsible for determining whether the allegations against Plaintiff should be formally investigated, taking into consideration the "complainant's explicit wishes." *Id.* at p. 36. Ms. Moschenross also had the conflicting role of determining the sanctions imposed on Plaintiff. *Id.* at p. 52.

47.     Ms. Moschenross is demonstrably biased against males, as shown in posts on her social media accounts:

   a. A tweet posted on 4/4/17 states that "[I]n Virginia, on average a woman would have to work until she is 71 years old to make what a man makes by the time he is 60."

   b. On 4/11/17 Ms. Moschenross tweeted that "[w]omen on average have to work until today…to earn what men earned by December 31, 2016."

   c. On 4/19/17, with respect to an article about presidential candidate Bernie Sanders in *The Washington Post*, Ms. Moschenross tweeted, "[y]es because what we've been lacking is another old white man that helped keep us from breaking down new barriers. No thanks."

   d. Two posts on Ms. Moschenross' Twitter account, dated 11/29/17 and 2/28/18, praise the fact that a number of famous men lost their jobs as a result of sexual harassment allegations, without formal adjudications finding them guilty of any of the accusations.

   e. On February 28, 2018, Ms. Moschenross posted an article about a sexual harassment case against Harvard in which the alleged victim of sexual harassment, a female professor, had to leave while the alleged harasser stayed. The article questioned whether the case caused other women not to come forward. Ms. Moschenross noted the article was "an important message for those of us doing Title IX work…a school invested in social justice may still have an opportunity to provide it for these women."

    f.   On Pinterest, Ms. Moschenross posted, "We are the granddaughters of all the witches you were never able to burn."

    g.   On Pinterest, Ms. Moschenross posted, "I'm a feminist. I've been female for a long time. I'd be stupid not to be on my own side."

Plaintiff notified the College about these biased posts. In response, Ms. Moschenross made her social media accounts private. The College did not remove Ms. Moschenross from Plaintiff's case. In fact, she has served as a decisionmaker in the majority of cases adjudicated at Grinnell, including *Grinnell 1* and *Grinnell 2*.

48.    In conducting an initial assessment of Plaintiff's case, neither Ms. Moschenross nor Ms. Asberry questioned the staleness of Jane Doe's allegations, nor, upon information and belief, that Jane Doe initially named someone else as the individual who allegedly sexually assaulted her. Neither Ms. Moschenross nor Ms. Asberry questioned the timing of the allegations against Plaintiff, which were contemporaneous to Jane Doe's allegations against a male professor.

49.    Throughout the Title IX process, Ms. Asberry and Ms. Moschenross acted without concern for Plaintiff's well-being. Sexual Misconduct Policy, at p. 39.

50.    Throughout the Title IX process, Plaintiff was reassured that the process was meant to be educational and that the outcome of his case would not be severe.

51.    The Title IX investigator assigned to Plaintiff's case failed to conduct "an equitable, thorough and impartial investigation" designed to "provide a fair and reliable gathering of facts" because:

    a.   He asked Plaintiff about the anonymous complaint and, upon information and belief, included information about it in the investigation report provided to the adjudicator, Justice Ternus.

    b.   He failed to ask Jane Doe questions which challenged her credibility or contradicted her account of what occurred. For example, Jane Doe alleged that Plaintiff should have been able to read her body language to know that she did not consent to digital penetration. The investigator did not ask her

17

whether the lights in the room were on or off at the time of her encounter with Plaintiff.

    c.  He failed to question witnesses identified by Jane Doe because she asked the investigator not to. For example, Jane Doe allegedly told a boyfriend about what happened with Plaintiff. She asked the investigator not to contact him, to which he said he "understood."

52.    Plaintiff did not have an "equal opportunity to be heard," as required by Grinnell policy (Sexual Misconduct Policy, at p. 45), because:

    a.  he was not fully apprised of the allegations against him until he was interviewed by Husch Blackwell;

    b.  Grinnell elected to investigate allegations that were over two years old, Plaintiff was unable to gather certain evidence in support of his defense such as old text messages;

    c.  the burden of proof was placed on Plaintiff to prove that he did not sexually assault Jane Doe;

    d.  Plaintiff had no means through which to confront his accuser, including no right of cross examination and no right to participate in Jane Doe's adjudication meeting with Justice Ternus;

    e.  Plaintiff was not given the opportunity to review the preliminary investigation report, provide comments to same or pose questions to Jane Doe (*see also* Sexual Misconduct Policy, at p. 47); and

    f.  during his "adjudication" meeting, Justice Ternus took an adversarial, aggressive position towards Plaintiff while she acted sympathetic and encouraging towards Jane Doe, engaging in more of an interview, and failing to ask Jane Doe any questions which challenged her credibility.

53.    Upon information and belief, irrelevant and prejudicial information, including the anonymous complaint and allegations about Plaintiff's character, reputation and sexual history, were included in the investigation report provided to Justice Ternus.

54.    Upon information and belief, Justice Ternus did not meet with the Title IX investigator prior to Plaintiff's adjudication meeting. *See* Sexual Misconduct Policy, at p. 49.

18

55.     Upon information and belief, Justice Ternus provided written recommendations to Ms. Moschenross concerning her decision in Plaintiff's case. Plaintiff was not provided with a copy of these recommendations.

## VII.    <u>Justice Ternus' Erroneous Finding</u>

56.     Plaintiff met with Justice Ternus on April 6, 2018. During the meeting, Justice Ternus seemed unconcerned about the potential impact of Jane Doe's allegations on Plaintiff's academic career and future.

57.     In contrast to the sympathetic and friendly tone that Justice Ternus exercised towards Jane Doe, her demeanor towards Plaintiff was harsh.

58.     When Plaintiff told Justice Ternus that Jane Doe had a propensity for dishonesty, and pointed to her contemporaneous allegations against the Grinnell professor, Justice Ternus was taken aback that Plaintiff would question Jane Doe's credibility.

59.     Justice Ternus failed to question why Jane Doe initially identified ***someone else*** as responsible for allegedly sexually assaulting her.

60.     Justice Ternus failed to question Jane Doe about her contemporaneous allegations against the Grinnell professor.

61.     Justice Ternus failed to question Jane Doe about why she waited over two years to file a Title IX complaint against Plaintiff.

62.     Justice Ternus failed to question Jane Doe about why she purportedly returned to Plaintiff's dorm room on the day after she was allegedly sexually assaulted.

63.     Subsequent to her meeting with Plaintiff, and without any follow up questions to Jane Doe, Justice Ternus found Plaintiff responsible for non-consensual sexual intercourse. This

decision was based solely on Jane Doe's account that Plaintiff digitally penetrated her while she had shorts on, despite Plaintiff's denial that any such activity occurred.

64.     Justice Ternus found that Plaintiff violated Grinnell's Sexual Misconduct Policy because **he did not obtain** Jane Doe's consent to engage in digital penetration. Yet by both Plaintiff's and Jane Doe's account of what happened, Plaintiff had consent for kissing Jane Doe and touching her breasts over her clothes. Putting aside that Plaintiff denied that digital penetration occurred, it would have been up to Jane Doe to withdraw consent for additional activities. Under the Sexual Misconduct Policy's definition of consent, which Justice Ternus ignored:

> Consent may be withdrawn by either party at any time. Withdrawal of consent must also be outwardly demonstrated by **mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity**. Once withdrawal of consent has been expressed, sexual activity must cease. *Id.* at pp. 19-20 (emphasis added).

Per Jane Doe's own statements, she never said no or otherwise verbalized that she did not consent to additional sexual activity with Plaintiff, and she took no action that indicated that she did not consent.

65.     Jane Doe asserted, and apparently Justice Ternus believed, that Plaintiff should have figured things out from her body language and facial expressions—yet, as Plaintiff reported during the investigation, the lights were out during the encounter in question. Moreover, this is not the applicable standard under Grinnell's definition of consent.

66.     In finding Plaintiff responsible for non-consensual sexual intercourse—which carried the likely sanction of suspension or dismissal from the College, and a campus ban (Sexual Misconduct Policy at p. 52)—Justice Ternus was supposed to examine whether there was consent "using **objectively apparent** indications of consent (or lack of consent) from a reasonableness perspective." *Id.* at pp. 19-20 (emphasis added). Based on Jane Doe's own statements, and

assuming that digital penetration occurred (it did not), there were no objectively apparent indications that Plaintiff would have been aware that he did not have consent to engage in sexual activity with Jane Doe.

67.     That Justice Ternus found Plaintiff responsible, despite no evidence to support the finding, demonstrates that she: failed to apply the preponderance of the evidence standard; simply presumed that Jane Doe was more credible; and placed the burden on Plaintiff to obtain consent from Jane Doe when the Sexual Misconduct Policy placed the burden on Jane Doe to withdraw consent.

68.     Justice Ternus' decision was, upon information and belief, influenced by her outdated and discriminatory views about the passivity, and lack of autonomy, which females exhibit during sexual encounters—views Justice Ternus has propounded in other cases that she adjudicated, as set forth below.

## VIII.   The Unduly Severe and Unwarranted Sanctions Imposed on Plaintiff

69.     By letter dated April 19, 2018, Ms. Moschenross notified Plaintiff that he was found responsible for non-consensual sexual intercourse. No basis was provided for the finding or the resulting sanctions that Ms. Moschenross elected to impose.

70.     Though Plaintiff was approximately one month away from graduation Moschenross *immediately* banned him from campus (he had 48 hours to leave even though his family was located in a different state)—before his submission of any appeal—and precluded him from walking at graduation. The ban remained in effect until after Jane Doe graduated.

71.     At the time that Ms. Moschenross imposed the immediate ban, Plaintiff had a broken hand, which he injured in the course of a campus job working for the College. Plaintiff's hand was in a cast and he could not drive. Plaintiff's father had to implore the College to give him

24 hours so that he could come to Grinnell from outside the state to assist Plaintiff in leaving Grinnell. Plaintiff was also unable to follow up with his surgeon, who was located in Iowa, after being forced to leave the College and return to his home state of Tennessee.

72.     Plaintiff was permitted to finish his coursework for the last semester remotely, but Moschenross issued a one-year suspension, such that Plaintiff's receipt of his Bachelor's degree was deferred until May 2019. In actuality, Plaintiff did not receive his degree until *he* requested it from the College's Registrar in December 2019.

73.     Ms. Moschenross' outcome letter referred to "the health and personal safety" of members of the Grinnell community. However, Plaintiff posed no threat to Jane Doe, as evidenced by the fact that the two coexisted on campus together *for over two years without incident* before she decided to file the Title IX complaint. There was simply no reason to punish Plaintiff so severely, particularly since, as discussed *supra*, there was no evidence of a policy violation in Plaintiff's case.

74.     It is clear that, in determining the sanctions, Ms. Moschenross gave no consideration to the impact of separating Plaintiff from his education, nor was the sanction proportionate to the violation, as required by Title IX guidance. Of paramount consideration to Ms. Moschenross was Jane Doe's purported need to be away from Plaintiff until she graduated in May 2019.

75.     Ms. Moschenross' punitive approach to sanctioning Plaintiff was also, upon information and belief, influenced by her discriminatory views of men and, in particular, men accused of sexual misconduct. *See supra* Paragraph 47.

76.     To the extent that Ms. Moschenross merely followed Justice Ternus' sanctioning recommendation, that recommendation was tainted with Justice Ternus' gender-biased views.

22

77.     As a result of the sanctioning decision, Grinnell maintains a permanent disciplinary record as part of Plaintiff's education records indicating that he was suspended for Title IX violations, even though the College elected not to mark his transcript. This means that, upon Plaintiff signing a release under the Family Educational Rights and Privacy Act ("FERPA"), Grinnell will release this conduct record and, potentially, the Title IX file to third parties. Plaintiff will need to sign such a release in order to attend graduate school, in order to pursue certain employment, and in the event that he ever needs to obtain security clearance for a chosen job.

## IX.     Andrea Conner Denies Plaintiff's Appeal

78.     Plaintiff timely submitted an appeal to Ms. Conner, the Associate Vice President of Student Affairs.[4] According to Plaintiff's appeal, he was:

a.   deprived of a fair and impartial resolution of Jane Doe's complaint, on the grounds that Justice Ternus and Ms. Moschenross were gender-biased and, at all times acted in favor of Jane Doe;

b.   the sanctions issued by Ms. Moschenross were disproportionate and intentionally punitive;

c.   Justice Ternus' findings, and the outcome ignored the definition of consent stated in Grinnell's Sexual Misconduct Policy and misapplied the relevant consent standard;

d.   the Title IX investigation was not conducted in a timely manner;

e.   the outcome letter provided inadequate notice to Plaintiff of the rationale behind the finding of responsibility and sanctions;

f.   Grinnell violated his right to privacy and attempted to prevent him from exercising his right to support during the initial Title IX meeting;

g.   Plaintiff was denied his right to a fair adjudication, including the right to be heard by an impartial decisionmaker and to confront his accuser;

---

[4] Ms. Conner left Grinnell on June 29, 2018. She started a position as Vice President of Student Affairs and Dean of Students at Lake Forest College in July 2018. Ms. Conner decided—*and denied*—the appeals in *Grinnell 1* and *Grinnell 2*. *See Grinnell 1*, SJ Op. at pp. 17-18; *Grinnell 2*, Compl. ¶¶ 201-205. Ms. Moschenross was promoted to Ms. Conner's position upon Ms. Conner's departure from Grinnell.

    h.   the evidence did not support the finding that Plaintiff violated the Sexual Misconduct Policy;

    i.   the Title IX process at Grinnell is inherently biased against men, improperly shifts the burden of proof to the male accused, and fails to provide male respondents with equal support and resources;

    j.   Grinnell's investigation of a complaint that was over two years old—and initially directed at a different person—supported Plaintiff's claim of gender bias in the process; and

    k.   Ms. Moschenross' meeting with Jane Doe as part of the "initial assessment" process, conflicting role as the party responsible for determining sanctions, and demonstrable gender bias (as indicated in her social media posts) tainted the process with gender bias.

79.    Ms. Conner, as Associate Vice President of Student Affairs, was responsible for deciding Plaintiff's appeal on one of two grounds: i) new evidence and ii) procedural error(s) that had a material impact on the outcome. Sexual Misconduct Policy at p. 54. Per the Sexual Misconduct Policy, Ms. Conner was to be impartial and was solely responsible for evaluating, and deciding, the appeal. Ms. Conner had the authority to affirm the original findings, alter the findings and/or alter the sanctions. *Id.* at p. 55.

80.    Ms. Conner was not an impartial appeal officer. She believes that all sexual misconduct cases began with dismissal as an outcome. This shows a built-in implicit bias which the law precludes.

81.    Ms. Conner participated in meetings with campus activist group Dissenting Voices, discussed below, and worked on changing the Sexual Misconduct Policy, to, in part, satisfy the group's demands. Ms. Conner also worked on revising the Sexual Misconduct Policy which removed the right of cross-examination, and to a hearing, from the sexual misconduct process.

82.     Ms. Conner believes that students found responsible for violating the Sexual Misconduct Policy should have to explain those violations to graduate schools and/or employers for the rest of their lives.

83.     While the appeal officer at Grinnell, Ms. Conner also believed that she was permitted to take actions that were not written in the College's Sexual Misconduct Policy and of which students would not have been on notice.

84.     Upon information and belief, as she had in other cases such as *Doe v. Grinnell*,[5] Ms. Conner invited Justice Ternus to review Plaintiff's appeal and to offer her comments to same. This infected the process with the same gender bias that was present in the adjudication process and also violated the Sexual Misconduct Policy.

85.     Upon information and belief, Ms. Conner relied on at least some of Justice Ternus' comments when drafting the appeal outcome letter in Plaintiff's case, if not copying and pasting Ternus' comments verbatim. It is, accordingly, no surprise that Ms. Conner denied Plaintiff's appeal.

86.     Upon information and belief, Ms. Conner also relied on Grinnell's Title IX counsel to draft her response to Plaintiff's appeal. Apparently, the process permits more professional legal assistance to the prosecution of allegations of sexual misconduct than it permits to respondents accused of sexual misconduct.

87.     Unsurprisingly, as she had in other cases, Ms. Conner denied Plaintiff's appeal. Her letter was replete with hostility towards Plaintiff:

   a.   She dismissed Plaintiff's assertion that he was denied a fair and impartial resolution as mere opinion, noting "your opinions are not relevant to this appeal."

   b.   She rejected Plaintiff's assertion that the sanctions imposed were punitive rather than educational, stating "it can feel punitive to be held accountable for one's own

---

[5] *Grinnell 1*, Doc. No. 129-1, at pp. 27-29; Order, July 9, 2019, Doc. No. 151, at pp. 17-18.

behavior with outcomes that create discomfort, inconvenience, or even disruption to one's educational trajectory."

c.  With respect to Plaintiff's assertion that Justice Ternus misapplied the Sexual Misconduct Policy's definition of consent, particularly with respect to withdrawal of consent, Ms. Conner exhibited bias towards Plaintiff and overlooked that Jane Doe was obligated to withdraw consent under the Sexual Misconduct Policy:

> *I am sorry to hear that you still have uncertainties about when your sexual partners are or are not consenting. In our policy, we require affirmative consent for each act. If you had consent for kissing, you also needed consent for additional sexual activity, meaning your partner had no obligation to verbalize her withdrawal of consent; on the contrary, you needed to obtain consent for the additional activity.*

d.  With respect to the inclusion of the anonymous complaint in the Jane Doe investigation, Ms. Conner encouraged Plaintiff "to raise this concern with the Title IX office, as I know they are deeply committed to always improving their work."

e.  With respect to the possibility that Justice Ternus made an incorrect finding that Jane Doe was more credible, Ms. Conner replied "We have confidence in our adjudicator (our trained adjudicator is a former Iowa Supreme Court Chief Justice)."

f.  With respect to Jane Doe's identification of someone other than Plaintiff as the perpetrator, Ms. Conner stated "by the time that the case got to adjudication—it had been made clear by [Jane Doe] that she was referencing you."

88.  Ms. Conner's decision was final.

## X.  **Grinnell's Gender-Biased Pattern of Decision Making**

### A.  **Grinnell Supports A Hostile Environment Towards Male Students**

89.  In 2017, prior to Plaintiff being falsely accused by Jane Doe, Plaintiff's roommate was also the subject of false, sexual misconduct accusations by a woman whom he briefly dated ("Student B"). Despite a lack of any credible evidence to support the claim, and no formal complaint or investigation, Grinnell allowed Student B to unleash a public smear campaign, on social media and across campus, against Plaintiff's roommate and any male student who spoke out in support of him. The female student threatened and sexually harassed Plaintiff's roommate. The

College took no action in response other than attempting to force Plaintiff's roommate to withdraw from the College.

90.     The College also took no action to stop Student B from publicly branding a number of male students as "rape apologists" and "sexual predators" in retaliation for their support of Plaintiff's roommate. One male student, a friend of Plaintiff's, suffered panic attacks as a result of being falsely branded as a sexual predator. He filed a complaint with the Title IX office. Nothing was done to stop Student B.

91.     Student B faced no discipline. On the contrary, the administration fully supported her. Immediately after Plaintiff's roommate left Grinnell, Plaintiff requested a no contact order with respect to Student B because of her open hostility towards male students on campus. The request was denied.

92.     Immediately after Plaintiff's roommate left Grinnell, Jane Doe, and the anonymous complainant, falsely accused Plaintiff of sexual misconduct. Upon information and belief, Jane Doe and the anonymous complainant were friends with Student B.

**B.     Grinnell Treats Female Respondents More Favorably Than Male Respondents**

93.     Grinnell has had a number of cases in which female students were accused of sexual misconduct and, in each case, the College and/or Justice Ternus treated the female accused more favorably and/or more leniently than male respondents in similar circumstances:

   a.   Grinnell informally resolved two, separate complaints against a female student accused of nonconsensual sexual intercourse by issuing no contact orders. In contrast, the College has given no leniency to male students accused of nonconsensual sexual intercourse, including Plaintiff.

   b.   Justice Ternus found a female student responsible for nonconsensual sexual intercourse. The complainant requested that the College place a notation on the respondent's transcript. Justice Ternus refused this request because it would impede the respondent's ability to complete her educational goals, gain employment and

become a responsible member of the community. The College issued only a campus ban as a sanction, after the adjudication process. Upon information and belief, the female respondent does not have a permanent disciplinary record.

c. Between January 1, 2014-June 30, 2018, the only cases that Grinnell informally resolved and subsequently reopened for a formal resolution process involved male respondents.[6]

Upon information and belief, there are other cases in which Justice Ternus and/or Grinnell treated female respondents more favorably than male respondents in circumstances similar to Plaintiff's. Records concerning outcomes in Grinnell's Title IX proceedings and the gender/gender identities of the parties involved are not publicly available and are in the exclusive possession of the College.

## C. Justice Ternus' Outdated and Discriminatory Views of Gender

94. Justice Ternus has also exhibited gender-biased assumptions when adjudicating other, publicly available cases involving male respondents. In *Grinnell 1* Justice Ternus: a) presumed that a female who is sexually inexperienced and "naïve," would not know how to tell her male partner to stop sexual activity; b) found it credible that a woman who was allegedly sexually assaulted by someone with whom she did not have a close relationship, would engage in a second, sexual encounter with the same male because she was young, inexperienced and wanted to make friends; c) failed to engage with evidence demonstrating that the second complainant chose to engage in sexual activity with the respondent; d) assumed that a woman who hadn't taken her birth control (but asked her sexual partner to wear a condom) would not consent to sex; and e) treated the male respondent more harshly than a respondent who was similarly charged.[7]

---

[6] *See Grinnell 1*, Doc. No. 129-3, at ¶¶ 88-96; Doc. No. 136, at ¶¶ 88-96; SJ Opinion, July 9, 2019, Doc. No. 151, at pp. 22-28.
[7] *See Grinnell 1*, Docket #129-1 at pp. 31-34; SJ Opinion, July 9, 2019, Doc. No. 151, at pp. 22-28.

95.     In *Grinnell 2*, the Plaintiff alleged that Justice Ternus:[8] a) assumed that a woman who is intoxicated is unlikely to be sexually aggressive, or forward; b) assumed that the fact that a male has an erection while spooning with a female (fully clothed) undermines the male's credibility if he denies having a sexual interest in the female; c) assumed that a man who kisses a woman intends to have sex with her; and d) failed to engage with a host of evidence that contradicted the complainants' allegations.[9]

96.     The gender bias described above remained unchecked by the procedures employed by Grinnell in sexual misconduct cases because Ms. Moschenross, responsible for sanctioning in Plaintiff's case, and Ms. Conner, responsible for deciding Plaintiff's appeal, not only held their own biases against male students but deferred to what they believed to be Justice Ternus' expertise and failed to question her findings and recommendations which were, on their face, clearly open to question.

97.     While Justice Ternus is a well-respected jurist, she had no experience with Title IX and limited or no experience with sexual assault cases, prior to being hired by Grinnell to serve as its sole adjudicator. Grinnell made no efforts to research her background or experience in these specific areas prior to hiring Justice Ternus. Because of her reputation, Ms. Moschenross and Ms. Conner deferred to Justice Ternus in every respect.

**XI.    Grinnell College's Endorsement of A Trauma-Informed Approach to Title IX Cases**

98.     Grinnell's Annual Title IX Report, for the 2017-2018 fiscal year, noted that Title IX Deputy Jen Jacobsen was a contributor to the American College Health Association's ("ACHA") "Addressing Sexual and Relationship Violence: A Trauma-Informed Approach"

---

[8] Notably, this student was expelled from Grinnell only a few months after Plaintiff was suspended, and his degree deferred.
[9] *See Grinnell 2*, Compl. ¶¶ 231-233.

("ACHA Report") and that Grinnell followed this "evidence-based guidance." As noted in the report, one of Grinnell's "ongoing goals" was to respond in a "trauma-informed way" to reports of prohibited conduct.

99.     The ACHA Report urges colleges to adopt a "trauma-informed approach," defined as:

> Trauma-informed approaches emphasize physical, psychological, and emotional safety for both providers and survivors, which allows survivors to rebuild a sense of safety, control, and empowerment. Trauma-informed approaches further involve vigilance in anticipating and avoiding institutional practices and processes that are likely to re-traumatize individuals with histories of trauma.

100.    The ACHA Report defines women as a "marginalized and vulnerable population" "at greater risk for victimization."

101.    The ACHA Report discusses, among other things:

- "Rape Culture" on college campuses, defined as "a complex of beliefs that encourages male sexual aggression and supports violence against women." *Id.* at p. 15. "A prominent element within rape culture is the endorsement of rape myths. These myths widely define 'real rape' as violent, physical, forced acts of sex often perpetrated by strangers and met with much resistance from victims. Such myths purport narratives that shift blame from the offender to the victim/survivor."

- "Male Involvement With Prevention Education," noting "sexual assault and relationship violence exist in a culture that encourages men to see themselves as different from and better than women. The hallmark of western masculinity is often seen as power and control." *Id.* at p. 17. The Report notes "many men may commit a broad range of violence acts in order to procure their manhood when structurally excluded from traditional male power structures due to race, ethnicity, class, sexual orientation or other identities." *Id.*

- "Sexual and relationship violence must be conceptualized as an issue of gender dynamics." *Id.* at 17.

- "Far too many men have done little more in the area of preventing sexual and relationship violence than to make a personal decision not to be a rapist or violent. This choice is often commended but is not sufficient." *Id.*

- "What is often difficult is to move beyond change at the individual and interpersonal level—the change in attitudes and behaviors of men towards women

30

and others who do not conform to the dominant masculine ideal. College campuses are uniquely situated in that each campus can create its own culture and social change and broader impact can be reached." *Id.* at 18.

- "It is recommended that these discussions of gendered power be approached indirectly to help minimize resistance." *Id.* at 18.

- "It is essential to recognize that a male…who does not recognize the structural dimensions of masculinity and who takes for granted his structural privileges will likely perceive women's empowerment as an actual loss and have a real sense of victimization. Being able to empathize, while not supporting the assumptions of men's victimization at the hands of women's empowerment, can help engage men." *Id.* at 19.

- "Specifics for Targeting Men in Prevention of Sexual and Relationship Violence"—"Understand the 'patriarchal dividend' that may have left many men unaware and complicit. Additionally, many people become defensive when discussing issues related to privilege and have trouble seeing how they benefit when they are often stuck in the oppressed status of their identity." *Id.*

102.    The ACHA Report also viewed the Title IX Coordinator, as a "first responder" to traumatized victims. *Id.* at p. 31.

103.    Grinnell administrators, including those involved in Plaintiff's Title IX proceedings, and Justice Ternus, the external adjudicator, were trained to use a "trauma-informed" response in sexual misconduct cases.

104.    A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event. Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual assault as opposed to considering them to be indicators that the complainant's story may lack credibility.

105.    Such training has recently come under fire from scientists and courts alike. *See* "Memory and Neuroscience Experts Warn Title IX Training Is Driven By Junk Science, at https://www.thecollegefix.com/bulletin-board/memory-neuroscience-experts-warn-title-ix-training-driven-junk-science/ ("One of the 'self-styled experts in the neurobiology of trauma' is Michigan State University's Rebecca Campbell,[10] who is ***not a neuroscientist*** and admits it's an 'overreach' to use her research as gospel in Title IX investigations"); "Judge Rebukes UC Santa Barbara for Using Trauma-Informed Approach in Title IX Proceeding" at https://www.thecollegefix.com/judge-rebukes-uc-santa-barbara-for-using-trauma-informed-approach-in-title-ix-proceeding/ *See also Norris v. U. of Colorado, Boulder*, 2019 WL 764568 at * 9 (D. Colo. 2019) (among other things, trauma-informed training supported plausible allegations of gender bias in Title IX proceedings).

106.    The Association of Title IX Administrators ("ATIXA") recently issued a position statement to colleges and universities warning that a complainant's perceived trauma must not be used as evidence that the alleged sexual misconduct has occurred. ATIXA further warned that the improper use of trauma-informed methods, such as to interpret evidence is junk science and must be avoided.[11]

107.    On January 25, 2018, *The Scarlet & Black* reported that Grinnell's Student Health and Counseling Services ("SHACS") had welcomed a new group on campus. "Defining Masculinity," the purpose of which was, in part, to facilitate a discussion among male-identifying students about healthy and toxic masculinity. Referencing the #metoo movement, the founder of the group noted that masculinity can often be toxic, with men "stuck thinking/feeling/acting in

---

[10] Campbell's work was cited in the ACHA report described *supra* Paragraphs 98-102, which Grinnell endorsed as part of its trauma-informed approach.
[11] https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIXA-Trauma-Position-Statement-Final-Version.pdf

ways that are traditionally accepted, not representative of who we are, and that are harmful to self and others…. [It is] absolutely imperative that male-identity groups need to address the different factors that may perpetuate men's physical and sexual violence."[12] Notably, a similar group was not offered with regard to notions of femininity, suggesting that only male-identifying individuals need assistance with "toxic" character traits and to avoid perpetrating acts of violence against women.

## XII.   **Backdrop for Gender Bias: Federal Pressure and Campus Activism**

### A.  **The April 4, 2011 Dear Colleague Letter**

108.     On April 4, 2011, the United States Department of Education's ("DE") Office for Civil Rights sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "2011 Dear Colleague Letter").

109.     The 2011 Dear Colleague Letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." 2011 Dear Colleague Letter at p. 4.

110.     The 2011 Dear Colleague Letter responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which had proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/ story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did

---

[12] http://www.thesandb.com/article/shacs-embraces-healthy-masculinity.html

engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

111.    The 2011 Dear Colleague Letter, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." 2011 Dear Colleague Letter, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the 2011 Dear Colleague Letter minimized the value and merit of due process protections for the accused by, among other things, eschewing a firm presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, limiting the right to an attorney, and forbidding certain forms of alternative dispute resolution.

112.    The April 2011 Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the 2011 Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing," standard of proof and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

113.    The 2011 Dear Colleague Letter stated that schools should "minimize the burden on the complainant," and suggested that schools focus more on victim advocacy. It required schools to give both parties the right to appeal a decision, which in too many instances affords Grinnell the opportunity to double down on its gender bias.

114.    The Obama Administration, through the DE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education in charge of OCR, delivered the following message to colleges and universities:

115.    In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

116.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a "trauma informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *Id.* at p. 31, which works to enforce a presumption of credibility of the alleged victim.

117.    In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to respondents accused of sexual assault.

118.    In June 2014, Lhamon testified at a Senate hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee that if OCR cannot secure voluntary compliance from a recipient,

OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the Department of Justice.

119.   In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working."[13]

120.   Grinnell receives federal funds, including Pell Grants, grants from the National Science Foundation, and other research grants.

121.   In Fall 2014, Grinnell's Title IX Coordinator at the time, Angela Voos ("Ms. Voos"), and Ms. Conner gave a Title IX presentation to Grinnell staff that discussed compliance with the 2011 Dear Colleague Letter and noted that the College's federal funding was at stake, and that the "stakes [we]re high." Grinnell's Title IX counsel also advised that compliance with Title IX was tied to government funding. The understanding amongst Grinnell administrators was that if they did not comply with OCR guidance that Grinnell would take a financial hit.

**B.   Campus Activists Prompt OCR Investigation at Grinnell**

122.   During Grinnell's Fall 2014 semester, a campus activist group was formed—known as "Dissenting Voices"—which publicized Grinnell's alleged retaliation against, and failure to

---

[13] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

protect, female sexual assault complainants and criticized the College's leniency towards males accused of sexual misconduct.

123.    Grinnell administrators have described the group's philosophy as aligning with "feminist philosophy." Dissenting Voices regularly criticized Grinnell's administration for fostering a campus "rape culture."

124.    Dissenting Voices was particularly critical of former Title IX Coordinator Angela Voos ("Ms. Voos"), whom they believed had a conflict of interest and lacked the experience necessary to carry out her duties.

125.    In response to a list of the group's demands, Ms. Voos and Ms. Conner met with members of Dissenting Voices in Fall 2014. At that time, Ms. Voos had internally expressed concerns about Title IX compliance and the threat of the loss of Grinnell's federal funding.

126.    Grinnell responded to, some say "catered to," certain of the group's demands by publishing a revised sexual misconduct policy mid-year, in Spring 2015. The revised policy did away with student/faculty conduct board hearings in sexual misconduct cases and the respondent's right of cross-examination. The revised policy also adopted the single adjudicator model typically helmed by Justice Ternus.

127.    Apart from pushing for policy changes, Dissenting Voices pushed for safe spaces for women on campus, called for "anti-sexist" training for men and demanded trauma-informed training for the administrators responsible for issuing sanctions so that more serious penalties would be imposed on respondents, including dismissal from the College.

128.    Dissenting Voices was responsible for female students filing of a number of complaints with OCR in or around March 2015, and for the publication, in March 2015, of an article in *The Huffington Post*, which criticized Grinnell's handling of sexual misconduct cases

and publicized the OCR complaints. The article included a quote from Ms. Conner, who served as the appeal officer in Plaintiff's case and numerous other cases, that "[w]hen a student is found responsible for sexual misconduct the college's first consideration is always dismissal."

129.    Shortly prior to publication of *The Huffington Post* article, Grinnell's President, Raynard Kington ("President Kington"), attempted to ward off an OCR investigation by requesting "technical assistance" from OCR, in essence requesting that the OCR conduct a review of Grinnell's sexual misconduct policies and procedures.

130.    On March 6, 2015, Dissenting Voices published an editorial in the campus newspaper which criticized President Kington's request for technical assistance as "redundant" and "a way of providing cover to the institution after years of betraying survivors."[14]

131.    Shortly after President Kington requested technical assistance from OCR, allegations surfaced accusing him of being verbally abusive to a female student, a sexual assault complainant, who had come to him for assistance and to lodge a complaint about the male respondent in her case, who was found responsible for sexual misconduct and went on to become the baccalaureate speaker for his class.[15]

132.    On March 24, 2015, OCR denied the College's request for technical assistance.

133.    On April 2, 2015, an opinion piece was published in the campus newspaper, *The Scarlet & Black*, calling for President Kington to resign.[16] The article noted that "I am …concerned about your personal treatment of sexual assault survivors, namely that you told a survivor you don't want to hear her voice and that you were ashamed a student like her would graduate from Grinnell."

---

[14] *See* http://www.thesandb.com/news/dissenting-voices-responds-to-grinnell-administration.html.
[15] *See* http://www.thesandb.com/opinion/letter-to-the-editor-can-you-hear-me-now-a-survivor-responds-to-the-chair-of-the-board-of-trustees.html
[16] http://www.thesandb.com/opinion/letter-to-the-editor-admin-created-hostile-environment-for-survivors.html.

134.    In July 2015, the OCR notified Grinnell that it was launching an investigation into allegations that the College had subjected female students to a hostile environment based on sex by failing to appropriately respond to complaints of sexual violence and by retaliating against female students who engaged in advocacy and were critical of Voos and the College.

135.    Grinnell's response focused on the manner in which it had changed its sexual misconduct policy and training programs, noting the mid-year change to the sexual misconduct policy—which stripped respondents of a right to a hearing and cross-examination—all in response to student advocacy.

136.    In August 2015, the female OCR complainants threatened litigation.

137.    On September 28, 2015, Grinnell announced several changes to its sexual misconduct policy, including the use of Husch Blackwell for conducting investigations, and new timelines for the investigation and appeal process.

138.    On October 2, 2015, *The Scarlet &Black*, published a letter to the editor from Dissenting Voices, discussing their amended aims and goals, which had been handed out on campus. The group urged the College to "address racism, sexism and homophobia within the sexual misconduct process."[17]

139.    In October 2015, Grinnell settled with the female OCR complainants and they withdrew their complaints. Upon information and belief, the settlement cost Grinnell millions of dollars.

140.    Though the OCR complaints were withdrawn, OCR continued the investigation until July 28, 2017.

---

[17] http://www.thesandb.com/opinion/letter-to-the-editor-dissenting-voices-releases-aims-and-goals.html

141.    On August 28, 2016, Dissenting Voices hosted a "Disorientation" table at new student orientation which informed students that Grinnell was under OCR investigation, and for which flyers were distributed which stated "Grinnell has a sexual assault problem and no one is talking about it."

142.    On or about September 17, 2016, members of Dissenting Voices handed out information in the campus center during Family Weekend. Per Dissenting Voices' Facebook page:

> For Family Weekend we decided to distribute information about the federal investigation of Grinnell to students, their families, and prospective students. A staff member of Student Affairs told us that we were not allowed to be in the JRC lobby because it was hosting the Family Weekend Welcome and Information Table. However, we continued to hand out our materials in a different area of the JRC.
>
> The school is interested in preserving a perfect, marketable image of Grinnell, regardless of the real issues students face on campus. As a school that markets itself as progressive and focused on social justice, why do we continue to hide the fact that we have a sexual assault problem? We, as an institution, continue to retraumatize and not help survivors. We must continue to push for policy change and increased resources.

143.    Shortly thereafter, in Fall 2016, Dissenting Voices held a demonstration during Trustee's Weekend calling for a new Title IX Coordinator who did not have so many conflicts of interest and wasn't "so closely tied to the image and standing of the college." The motivation for this criticism was that Ms. Voos held multiple roles besides Title IX Coordinator, including Chief of Staff and Vice President of Strategic Planning for Grinnell.

144.    On November 4, 2016, *The Scarlet & Black* published an article about Dissenting Voices' efforts to combat sexual assault during the Fall 2016 semester.[18] The article noted that the group had gained faculty support. More specifically, English Professor Theresa Geller ("Professor Geller") had joined their cause, Faculty Against Rape. Dissenting Voices member Leah Barr said that one of Dissenting Voices' goals was "to keep the momentum going and make sure that people

---

[18] http://www.thesandb.com/news/dissenting-voices-combats-campus-sexual-assault-throughout-semester.html

are still angry, because there's a lot to be angry about." Ms. Barr pointed out that at new student orientation the OCR investigation was not mentioned by administrators. Barr further stated:

> For the most part, rapists on this campus are not expelled. They sometimes receive sanctions, no contact orders…[which] don't do anything…Rapists know they can rape with impunity. They know that they're not really going to be punished. So it doesn't deter them. So if we create these policies with more stringent punishments or sanctions, I think the incidents of rape would go down. But the general consensus on campus is you can rape multiple people and not much is going to happen to you.

145.    On November 8, 2016, Dissenting Voices and Professor Geller held an Open House to discuss Dissenting Voices Aims and Goals and grassroots activism.

146.    On November 17, 2016, Dissenting Voices sponsored a lecture by Dr. Caroline Heldman on "The New Campus Anti-Rape Movement: Networked Activism for Change." The focus of the lecture was about how student activists could use social media to shame institutions and hold them accountable for failing to address sexual assault.

147.    On November 19, 2016 Dissenting Voices organized a women's self-defense seminar.

148.    On April 9, 2017, Dissenting Voices held a protest during programming for prospective students. Per coverage in *The Scarlet & Black*, the location and time of the protest were meant to be provocative.[19] Some of the protesters held signs noting "Expel Rapists." The article further noted, without support, "As 90 percent of campus rapes are committed by repeat offenders, Dissenting Voices sees the establishment of this minimum outcome as not only a justice issue, but one of safety as well." Leah Barr noted "It makes financial sense for the Title IX coordinator to be wrapped up in the president's office because part of the president's job is fundraising and image control. So if you have full control over which rape becomes publicly known…the image is protected."

---

[19] http://www.thesandb.com/article/protests-at-admitted-students-weekend.html

149.    On April 28, 2017, Dissenting Voices published a letter to the Board of Trustees, raising concerns about serial assailants on campus and calling for minimum outcomes in sexual misconduct cases.

150.    On April 29 and May 6, 2017 Dissenting Voices hosted a "teach-in series" on Feminist Theory, including the "Politics of Sexual Violence."

151.    On September 1, 2017, *The Scarlet & Black* announced the closure of the OCR investigation at Grinnell.[20] In the article a co-leader of Dissenting Voices expressed concerns regarding the closure of the investigation and said that Dissenting Voices planned to file a FOIA request to determine whether Grinnell settled with the complainants and, as part of that settlement, required them to withdraw their complaints. The article noted that the closure of the investigation may have had more to do with the Trump administration's change in investigation strategy rather than the lack of any problems in Grinnell's sexual misconduct process. Ms. Voos noted that Grinnell would be changing its sanctioning policy with respect to sexual misconduct, to reflect "typical outcomes" such as "dismissal or suspension." This change was made in response to Dissenting Voices repeated calls for "mandatory minimum" sanctions in sexual misconduct cases.

### C.  The U.S. Department of Education Rescinds 2011 Dear Colleague Letter

152.    On September 7, 2017 the United States Secretary of Education, Betsy DeVos ("DeVos") vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos stated that "one person denied due process is one too many."[21]

153.    The failure of educational institutions to provide fair and impartial policies and procedures led DeVos to declare that "the current approach isn't working. Washington has

---

[20] http://www.thesandb.com/news/ocr-administratively-closes-the-colleges-title-ix-investigations.html
[21] https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be judge and jury?"  Moreover, DeVos stated, "It's no wonder so many call these proceedings 'kangaroo courts.' Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

154.   Regarding pressure from the OCR on institutions to adhere to "the failed system imposed policy by political letter," DeVos stated, "No school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."

155.   Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over."  The "April 2011 Dear Colleague Letter" has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined."  Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

156.   On September 22, 2017, the OCR rescinded the 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

157.   The OCR noted that the 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added).[22] .

---

[22] *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

158.    On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "2017 Guidance").[23] The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

159.    The 2017 Guidance requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. *See id.* The 2017 Guidance also permitted schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

160.    On September 25, 2017, Grinnell's Title IX Office issued a campus memo to address the rescission of the 2011 Dear Colleague Letter and 2014 Q&A, and the OCR's issuance of new guidance.[24] The memo informed students that the College would continue to employ the "preponderance of the evidence" standard in sexual misconduct cases. The memo noted that the new guidance permitted colleges to facilitate informal resolution, including mediation, and that the College was "looking into the implications of this change." It continued "At this time, we do not believe the announcement will affect our policies and procedures."

---

[23] *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.
[24] www.grinnell.edu/news/special-campus-memo-title-ix

161.    Ms. Voos gave a statement to *The Scarlet & Black* in which she stated "Our disciplinary process already addressed the issue that they're looking at-that is, do you have a fair and thorough and impartial way of investigating and adjudicating…. most of this guidance is about choices. It's permitting some scaling back—we're not scaling back."[25]

162.    On November 9, 2017, Dissenting Voices held a vigil for survivors of sexual assault in response to the DE's rescission of the 2011 Dear Colleague Letter. During an interview about the vigil, one of the co-leaders of Dissenting Voices was asked whether the process in place under the 2011 Dear Colleague Letter was biased against male students accused of sexual misconduct. In response, she said "the system doesn't do enough to back survivors and ensure that rapists are kept from becoming serial rapists. And the fact that the Trump administration is lessening this is quite worrisome."[26]

163.    Part of the November 9, 2017 vigil was the creation of a display supporting sexual assault survivors. It was immediately removed by campus officials after the event. On November 14, 2017 Dissenting Voices published an opinion piece complaining about the removal.

164.    On January 25, 2018, a former member of Dissenting Voices and Grinnell alumna wrote a letter to the editor of *The Scarlet & Black*, "An Elegy For Feminist Justice At Grinnell," that stated that, through "radical feminist praxis" Dissenting Voices "accomplished many things, including….directing Grinnell's issue to national attention through the Huffington Post, and most importantly, the opening of an official Title IX Complaint to the Office of Civil Rights….While the OCR is no longer investigating …it set an important precedent at Grinnell that rendered visible

---

[25]http://www.thesandb.com/news/college-to-uphold-most-obama-era-title-ix-guidelines-reconsider-mediation-approach.html
[26] http://www.thesandb.com/news/dissenting-voices-holds-national-vigil-to-support-survivors-of-sexual-assault.html

the possibility of legal action against parties responsible for sexual discrimination, and the weight that legal action can have on changing policies and procedures."

165.    The article went on to state "Feminist theorists such as Susan Brownmiller have re-theorized sexual violence as crime of power, not a crime of passion. Sexual violence has been used historically to control and dominate women's bodies to reinforce women's place as one in the private and domestic sphere… Dissenting Voices have received critique from the administration for our protests against policies and practices from our Title IX office. The reason why feminist activists have critiqued the administration is because our campus does not provide an equal access campus. It is not equal access when a countless number of serial rapists graduate while their peers affected by their violence are on medical leave. In May 2017, I walked Commencement stage with a banner that read: 'We are Graduating with Two Serial Rapists' only to learn two days later that number should have been five."

166.    Finally, the article stated "Dissenting Voices has been effective because of the recognition of the College's investment in its image. We've hit them where it hurts: their public identity and their money."[27]

### COUNT I
### Violations of Title IX of the Education Amendments of 1972
### Erroneous Outcome/Selective Enforcement

167.    Plaintiff repeats and realleges each and every allegation set forth above, in Paragraphs 1-166, as if fully set forth herein.

168.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

---

[27] *See* http://www.thesandb.com/article/letter-to-the-editor-an-elegy-for-feminist-justice-at-grinnell.html.

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

169.    Title IX applies to an entire school or institution if any part of that school receives federal funds. Grinnell receives federal funds, including Pell Grants, grants from the National Science Foundation, and other research grants.

170.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.   34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including non-consensual sexual intercourse, sexual assault, and rape.[28]

171.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." *See* 2001 Guidance at p. 20.

172.    The OCR's 2017 Guidance further requires that:

   a)   training materials that apply sex stereotypes or generalization be avoided to ensure a fair and impartial investigation;

---

[28] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) (the "2001 Guidance") at 19-20, 21 & nn. 98-101.

b) decision-making techniques or approaches that apply sex stereotypes or generalizations be avoided to ensure an objective and impartial investigation; and

c) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation.

173.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision to discipline.

174.    Challenges to the outcome of college disciplinary proceedings can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the plaintiff is innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim is that, regardless of the plaintiff's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the respondent's gender.

175.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

176.    Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent college officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F.3d at 715. For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d at 57.

177.    Outdated and discriminatory views of sexuality and gender on the part of a key decisionmaker in a Title IX proceeding will also show that the proceeding was infected with gender bias. *Marymount*, 297 F. Supp. 3d at 586. *See also Grinnell 1*, SJ Order, at pp. 22-28.

178.    Articulable doubt in the accuracy of the outcome of a disciplinary proceeding can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Marymount U.*, 297 F. Supp. 3d at 584. *See Yusuf*, 35 F. 3d at 715.

179.    An erroneous outcome occurred in this case because Plaintiff, who was innocent, was subjected to a blatantly flawed process and proceedings and erroneously found responsible for violating Grinnell's Sexual Misconduct Policy, and gender was a motivating factor behind this erroneous outcome.

180.    Beginning in Fall 2014 and up until the time that Plaintiff's Title IX proceedings were underway, Grinnell was under tremendous pressure to respond to criticism from campus activist group Dissenting Voices, to correct its failings and take a more aggressive stance towards male students accused of sexual misconduct.

181.    Dissenting Voices regularly criticized the administration for creating a hostile environment for female students and held protests across campus during high profile events, ensuring that students and parents alike were aware that, according to Dissenting Voices, Grinnell had a sexual assault problem.

182.    Grinnell administrators—including the appeal officer in Plaintiff's case—met with members of Dissenting Voices and revised the College's sexual misconduct policy and procedures so that the accused were no longer afforded a hearing or the right of cross-examination.

183.    When notified that the OCR was investigating the College, in response to well-publicized complaints prompted by Dissenting Voices, Grinnell responded by emphasizing these policy changes, noting that they were made in response to student activism.

184.    In October 2015, Grinnell entered into a financial settlement with the female, OCR complainants which, upon information and belief, amounted to millions of dollars.

185.    The OCR investigation did not conclude until nearly two years later, in September 2017.

186.    Dissenting Voices continued to criticize the administration. On January 25, 2018, at around the time Jane Doe filed her Title IX complaint against Plaintiff, Dissenting Voices claimed that "a countless number of serial rapists" were being permitted to graduate from Grinnell "while their peers affected by violence are on medical leave." Upon information and belief, Jane Doe was a member of Dissenting Voices.

187.    In response to Dissenting Voices' demands, Grinnell adopted a trauma-informed approach to sexual misconduct proceedings. More specifically, Grinnell adopted what it referred to as "evidence-based guidance" which portrayed women as at greater risk for victimization and men as toxic and privileged by a "patriarchal dividend" that left them "unaware and complicit" in sexual violence against women.

188.    Grinnell trained its personnel, including Justice Ternus, the adjudicator in Plaintiff's case, to adopt a trauma-informed approach in sexual misconduct proceedings.

189.    Since doing away with the hearing model in sexual misconduct cases, Grinnell has also engaged in a gender-biased pattern of decision-making in sexual misconduct cases as female respondents have been treated more favorably, and more leniently, than male respondents.

190.     Justice Ternus has also exhibited gender-biased decision-making in cases other than Plaintiff's. In cases involving female respondents, Justice Ternus has treated those respondents more favorably, and more leniently, than male respondents.

191.     In cases other than Plaintiff's, Justice Ternus has also attributed stereotypical traits to female complainants and male respondents, attributing traits like naïveté and passivity to the female complainant and sexual experience and aggressiveness to the male respondent. *See Grinnell 1*, Order, July 9, 2019, Doc. No. 151, at pp. 22-28; *Grinnell 2*, Doc. No. 1, Compl. ¶¶ 117-136, 151-166, 181-185 and 186-190.

192.     Ms. Moschenross, who determined the sanctions in Plaintiff's case, has made numerous public statements which are indicative of bias against men.

193.     Ms. Conner also demonstrated bias against Plaintiff in determining his appeal. She has, further, endorsed an overly punitive approach to those found responsible for sexual misconduct.

194.     In Plaintiff's case, the following occurred, which is indicative of gender bias in the proceedings:

a.   The Husch Blackwell investigator failed to ask Jane Doe questions which challenged her credibility, including why she initially named a person other than Plaintiff as the perpetrator of the alleged sexual misconduct. The investigator also declined to interview Jane Doe's former boyfriend at Jane Doe's request.

b.   During Jane Doe's adjudication meeting, Justice Ternus was encouraging and supportive and failed to ask any questions which challenged Jane Doe's credibility.

c.   Justice Ternus treated Plaintiff harshly and without concern for the potential impact of the outcome of Jane Doe's allegations. Justice Ternus was taken aback when Plaintiff challenged Jane Doe's credibility during his adjudication meeting.

d.   Justice Ternus failed to engage with evidence, that contradicted Jane Doe's allegations, including Jane Doe's own statements that she never said no to the sexual activity in question or verbalized a lack of consent. Justice Ternus simply found Jane Doe to be more credible despite evidence to the contrary.

e.  Justice Ternus misapplied the definition of consent stated in the Sexual Misconduct Policy, placing the burden fully on Plaintiff to obtain consent, rather than placing the burden on Jane Doe to appropriately withdraw consent.

f.  Justice Ternus holds outdated and discriminatory views of gender, including notions concerning female passivity during sexual encounters which, upon information and belief, influenced her decision in Plaintiff's case.

g.  Ms. Moschenross who, among other things, publicly stated that she is on the side of women because she is a woman, imposed an unduly severe and unwarranted sanction against Plaintiff under the purported threat of harm to the community. Yet Plaintiff and Jane Doe attended the College for over two years after the alleged encounter without incident.

h.  Ms. Conner's letter denying Plaintiff's appeal was dripping with hostility towards Plaintiff, including the statement "I am sorry to hear that you still have uncertainties about when your sexual partners are or are not consenting." Plaintiff never expressed such uncertainty, and certainly not in his appeal. Ms. Conner ignored that Jane Doe was responsible for withdrawing consent in accordance with the Sexual Misconduct Policy and that Doe's own statements demonstrated that there was no policy violation. Ms. Conner also overlooked the bias in the Title IX process, dismissing as Plaintiff's mere disagreement with, or opinions about, the outcome. Ms. Conner asserted that because Justice Ternus was a former Supreme Court Justice she could not be biased.

195.  The flawed manner in which the "investigation" and adjudication of the allegations against Plaintiff were conducted also casts doubt on the accuracy of the outcome. Grinnell failed to conduct a fair, adequate, reliable and impartial investigation and adjudication of the complaints against Plaintiff because, without limitation:

a.  The decisionmakers in Plaintiff's case were hardly impartial and were, in fact, biased against males;

b.  Neither the investigator nor the adjudicator questioned Jane Doe about key issues, including why she named someone else as the perpetrator and why she waited over two years to make a complaint against Plaintiff;

c.  Ms. Moschenross was responsible for initially meeting with Jane Doe to conduct a case assessment and for sanctioning Plaintiff;

d.  Plaintiff was not fully apprised of the allegations against him until he met with the Title IX investigator;

e.   Ms. Asberry and Ms. Moschenross bolstered Jane Doe's complaint by using an anonymous complaint, which ultimately was not pursued, as grounds to conduct a formal investigation under a purported pattern of behavior;

f.   The Title IX investigator asked Plaintiff about the anonymous complaint after Plaintiff was told the College was not investigating said complaint. This information was included in the investigation report provided to Justice Ternus;

g.   The Title IX investigator failed to question Jane Doe's former boyfriend;

h.   Because over two years had passed since his encounter with Jane Doe, Plaintiff was unable to collect all evidence relevant to his defense;

i.   Plaintiff did not have an equal opportunity to be heard;

j.   Prejudicial and irrelevant information was included in the investigation report that was provided to Justice Ternus;

k.   Justice Ternus' finding of responsibility was not supported by the evidence and grounded, in part, in (i) her misapplication of the definition of consent in the Sexual Misconduct Policy; and (ii) failure to apply the preponderance of the evidence standard;

l.   Upon information and belief, Justice Ternus provided written recommendations to Ms. Moschenross with respect to Plaintiff's sanctions that were not shared with Plaintiff;

m.   Ms. Moschenross issued disproportionate sanctions and failed to consider the impact of those sanctions on Plaintiff. She also created a false narrative that Plaintiff was a threat to the community when Plaintiff and Jane Doe had coexisted on Grinnell's campus for over two years;

n.   Upon information and belief, Justice Ternus and Grinnell's Title IX counsel reviewed Plaintiff's appeal; and

o.   Ms. Conner's denial of Plaintiff's appeal was improper given the number of procedural flaws, including a lack of impartiality, that tainted the proceedings.

196.   Grinnell has also engaged in selective enforcement. Female respondents accused of similar misconduct are given far less severe sanctions than male respondents:

- In the case of Student B, who waged a public smear campaign against Plaintiff's roommate and other male students, the College took little or no action to stop her

harassment and abuse. The College took no action with respect to the Title IX complaint filed against Student B by Plaintiff's friend, whom she had called a rapist. Plaintiff's roommate was forced to leave the College even though Student B never filed a formal complaint. The College denied Plaintiff a no contact order with respect to Student B after Plaintiff's roommate left.

- Grinnell informally resolved two, separate complaints against a female student accused of nonconsensual sexual intercourse by issuing no contact orders. Leniency was given to the female student. In contrast, the College has given no leniency to male students accused of sexual misconduct, including Plaintiff.

- Justice Ternus found a female student responsible for nonconsensual sexual intercourse. The complainant requested that the College place a notation on the respondent's transcript. Justice Ternus refused this request because it would impede the female respondent's ability to complete her educational goals, gain employment and become a responsible member of the community. The College issued only a campus ban as a sanction, after the adjudication process. Upon information and belief, the female respondent does not have a permanent conduct record. Here, Justice Ternus' attitude towards Plaintiff was punitive.

- Between January 1, 2014 and June 30, 2018, the only cases that Grinnell informally resolved and then reopened for a subsequent, formal resolution process involved male respondents.

197.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

198.   As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

199.   Grinnell's violation of Title IX resulted in erroneous, unduly severe and unwarranted sanctions which continue to injure Plaintiff's reputation. Accordingly, an injunction should issue directing Grinnell to (i) reverse the outcome and finding; (ii) vacate the sanctions; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not

limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any and all records concerning the Title IX investigation, findings, outcome, sanctions and Plaintiff's appeal.

200.    As a result of the foregoing, Plaintiff is also entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## State Law-Breach of Contract

201.    Plaintiff repeats and realleges each and every allegation set forth above, in Paragraphs 1-166, as if fully set forth herein.

202.    Under Iowa law, Grinnell's Sexual Misconduct Policy created a contractual relationship between Grinnell and its students. *See, e.g. T.E. v. Linn-Mar Community School Dist.*, No. LACV 35077, 2000 WL 34514000 (Iowa Dist. Ct. Aug. 30, 2000); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443 (1984).

203.    Grinnell breached the Sexual Misconduct Policy by:

    i.  Engaging in sex discrimination against Plaintiff. *See* Sexual Misconduct Policy, at p. 3.

    ii.  Failing to "approach the assessment of each report with an earnest intent to understand the perspective and experience of each individual involved in order to ensure fair and impartial evaluation and resolution." *Id.* at p. 29.

    iii.  Failing to act in consideration of Plaintiff's well-being. *Id.* at p. 39.

    iv.  Failing to resolve the matter within 60 days. *Id.* at p. 41.

    v.  Failing to provide written notice to Plaintiff as to the reasons for delays in conducting the investigation. *Id.* at p. 41.

    vi.  Failing to provide a fair and reliable gathering of facts by the investigator, who included unsubstantiated, "anonymous" allegations in the investigation and resulting report. *Id.* at p. 44.

vii.   Depriving Plaintiff of the right to review the preliminary investigation report and pose questions to Jane Doe. *Id.*

viii.   Including information that was "irrelevant, more prejudicial than probative or immaterial" in the investigation report. *Id.* at p. 47.

ix.   Depriving Plaintiff of an equal opportunity to be heard. *Id.* at p. 45.

x.   Taking an adversarial stance against Plaintiff at his adjudication meeting. *Id.* at p. 51.

xi.   Failing to apply the preponderance of the evidence standard. *Id.* at p. 51.

xii.   Failing to follow adjudication procedures, as Justice Ternus did not meet with a member of the investigation team. *Id.* at p. 49.

xiii.   Permitting, upon information and belief, Justice Ternus and others to review Plaintiff's appeal.

204.    Plaintiff suffered substantial economic losses as a result of the direct, proximate, and foreseeable consequence of the foregoing breaches.

205.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT III
**State Law -Breach of the Implied Covenant of Good Faith and Fair Dealing**

206.    Plaintiff repeats and realleges each and every allegation above, set forth in Paragraphs 1-166, as if it fully set forth herein.

207.    Under Iowa law it is generally recognized that there is an implied covenant of good faith and fair dealing in a contract. *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 n. 4 (Iowa 2001).

208.    Grinnell breached that covenant when Ms. Moschenross and Ms. Conner acted in deference to Justice Ternus and failed to exercise independent judgment in determining

Plaintiff's sanction and appeal. Ms. Moschenross and Ms. Conner were each designated as the sole arbiters of the sanction and appeal, respectively, under the Sexual Misconduct Policy.

209.    Grinnell also breached that covenant when, upon information and belief, Ms. Conner permitted Justice Ternus to weigh in on Plaintiff's appeal. Justice Ternus is not cited as an appellate officer in the Sexual Misconduct Policy.

210.    Upon information and belief, Grinnell administrators diverged from Grinnell's Sexual Misconduct policy and procedures, employing unwritten procedures and allowing administrators who were not expressly provided decision-making authority to make decisions in Plaintiff's case.

211.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT IV
### Wrongful Discipline: Lack of Fundamental Fairness in Disciplinary Proceedings

212.    Plaintiff John Doe repeats and realleges each and every allegation above, set forth in Paragraphs 1-166, as if fully set forth herein.

213.    Iowa state courts, and the United States Court of Appeals for the Eight Circuit, recognize that private school students facing disciplinary actions are entitled to a disciplinary process that: (i) adheres to the school's established standards, and (ii) is not arbitrary, unreasonable, or conducted in bad faith. *See Harvey v. Palmer Coll. of Chiropractic*, 363 N.W.2d 443, 444 (Iowa Ct. App. 1984) ("'The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities.' . . . It is clear . . . that a private university may not expel a student arbitrarily, unreasonably, or in bad faith." (citations omitted)); *see also Warren v. Drake Univ.*, 886 F.2d 200, 202 (8th Cir. 1989) (citing *Harvey*).

214. In the instant case, Grinnell's disciplinary process neither conformed to its established procedures, nor satisfied principles of fundamental fairness and due process because, without limitation:

a. Plaintiff was not fully apprised of the allegations against him until he met with the Title IX investigator.

b. The Title IX investigator asked Plaintiff about an anonymous complaint after Plaintiff was told the College was not investigating said complaint. This information was included in the investigation report provided to Justice Ternus.

c. The Title IX investigator failed to question Jane Doe's former boyfriend.

d. The Title IX investigator failed to ask Jane Doe questions which challenged her credibility, including why she initially named a person other than Plaintiff as the perpetrator of the alleged sexual misconduct. The investigator also declined to interview Jane Doe's former boyfriend at Jane Doe's request.

e. Plaintiff was not given the opportunity to review the preliminary investigation report or pose questions to Jane Doe.

f. Plaintiff had no opportunity to confront, or cross-examine, Jane Doe.

g. Because over two years had passed since his encounter with Jane Doe, Plaintiff was unable to collect all evidence relevant to his defense.

h. Plaintiff did not have an equal opportunity to be heard.

i. Prejudicial and irrelevant information was included in the investigation report that was provided to Justice Ternus.

j. During Jane Doe's adjudication meeting, Justice Ternus was encouraging and supportive and failed to ask her any questions which challenged Jane Doe's credibility.

k. Justice Ternus treated Plaintiff harshly and without concern for the potential impact of the outcome of Jane Doe's allegations. Justice Ternus was taken aback when Plaintiff challenged Jane Doe's credibility during his adjudication meeting.

l. Justice Ternus failed to engage with evidence that contradicted Jane Doe's allegations, including Jane Doe's own statements that she never said no to the sexual activity in question or verbalized a lack of consent. Justice Ternus simply found Jane Doe to be more credible despite evidence to the contrary.

m. Justice Ternus misapplied the definition of consent stated in the Sexual Misconduct Policy, placing the burden fully on Plaintiff to obtain consent, rather than placing the burden on Jane Doe to appropriately withdraw consent.

n. Justice Ternus holds outdated and discriminatory views of gender, including notions concerning female passivity during sexual encounters which, upon information and belief, influenced her decision in Plaintiff's case.

o. Justice Ternus failed to apply the preponderance of the evidence standard.

p. Ms. Moschenross was responsible for initially meeting with Jane Doe to conduct a case assessment and for sanctioning Plaintiff.

q. Ms. Moschenross who, among other things, publicly stated that she is on the side of women because she is a woman, imposed an unduly severe and unwarranted sanction against Plaintiff under the purported threat of harm to the community. Yet Plaintiff and Jane Doe coexisted at the College for over two years after the alleged encounter without incident.

r. Upon information and belief, Justice Ternus provided written recommendations to Ms. Moschenross with respect to Plaintiff's sanctions that were not shared with Plaintiff.

s. Upon information and belief, Justice Ternus and Grinnell's Title IX counsel reviewed Plaintiff's appeal.

t. Ms. Conner's letter denying Plaintiff's appeal was dripping with hostility towards Plaintiff, including the statement "I am sorry to hear that you still have uncertainties about when your sexual partners are or are not consenting." Plaintiff never expressed such uncertainty, and certainly not in his appeal. Ms. Conner ignored that Jane Doe was responsible for withdrawing consent in accordance with the Sexual Misconduct Policy and that Doe's own statements demonstrated that there was no policy violation. Ms. Conner also overlooked the bias in the Title IX process, dismissing it as Plaintiff's mere disagreement with, or opinions about, the outcome. Ms. Conner asserted that because Justice Ternus was a former Supreme Court Justice she could not be biased.

u. Ms. Conner's denial of Plaintiff's appeal was improper given the number of procedural flaws, including a lack of impartiality, that tainted the proceedings.

215. Grinnell's overwhelming failure to conduct a thorough, fair, and impartial investigation and adjudication of the claims against Plaintiff resulted in findings and sanctions that were arbitrary, unreasonable, imposed in bad faith, not in compliance with Grinnell's published

policies, and ultimately deprived Plaintiff of due process to which he was entitled both by common law and by Grinnell's own express promises.

216.    Plaintiff has an undeniably strong interest in his disciplinary and educational files, which Grinnell has permanently marked and which it will release to third parties, including graduate schools, potential employers and in the event Plaintiff seeks security clearance for a particular job.

217.    Grinnell's arbitrary, unreasonable, unfair and inappropriate actions caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

218.    As result of the foregoing, Accordingly, an injunction should issue directing Grinnell to (i) reverse the outcome and finding; (ii) vacate the sanctions; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any and all records concerning the Title IX investigation, findings, outcome, sanctions and Plaintiff's appeal.

219.    As a result of the foregoing, Plaintiff is also entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant Grinnell College as follows:

(i)     On the first count, for violations of Title IX of the Education Amendments of 1972, Plaintiff is entitled to damages in an amount to be determined at trial, plus

prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Grinnell to: (i) reverse the outcome and finding; (ii) vacate the sanctions; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any and all records concerning the Title IX investigation, findings, outcome, sanctions and Plaintiff's appeal;

(ii)     On the second count, for state law breach of contract, damages in an amount to be determined at trial, plus prejudgment interest;

(iii)    On the third count, for state law breach of the implied covenant of good faith and fair dealing, damages in an amount to be determined at trial, plus prejudgment interest;

(iv)     On the fourth count, for wrongful discipline/lack of fundamental fairness in disciplinary proceedings, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Grinnell to (i) reverse the outcome and finding; (ii) vacate the sanctions; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any and all records concerning the Title IX investigation, findings, outcome, sanctions and Plaintiff's appeal;

(v)      Equitable relief in the form of an order directing Grinnell to (i) reverse the outcome and finding; (ii) vacate the sanctions; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any and all records concerning the Title IX investigation, findings, outcome, sanctions and Plaintiff's appeal.

(vi)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: March 20, 2020

BABICH GOLDMAN, P.C.

/s/ David H. Goldman
    David H. Goldman
Amy K. Davis
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: adavis@babichgoldman.com

      -and-

NESENOFF & MILTENBERG, LLP

/s/ Andrew T. Miltenberg
    Andrew T. Miltenberg (*pro hac vice* admission pending)
Kara L. Gorycki (*pro hac vice* admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: kgorycki@nmllplaw.com
Email: amiltenberg@nmllplaw.com

***Attorneys for Plaintiff***